UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MONTICELLO INSURANCE COMPANY,**

**Plaintiff,**

-vs-                                                    **Case No.  6:03-cv-1514-Orl-19KRS**

**NATIONAL CASUALTY COMPANY,**

**Defendant.**

_____

# ORDER

This case comes before the Court on the following:

1.    Defendant's Dispositive Motion for Final Summary Judgment (Doc. No. 30, filed Mar. 15, 2005); Memorandum of Law in Support of Defendant's Motion (Doc. No. 32, filed Mar. 15, 2005); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion (Doc. No. 45, filed Apr. 28, 2005).

2.    Plaintiff's Amended Motion for Summary Judgment with Incorporated Memorandum of Law (Doc. No. 40, filed Mar. 25, 2005); Defendant's Memorandum of Law in Opposition to Plaintiff's Amended Motion (Doc. No. 43, filed Apr. 8, 2005).

## Background[1]

Martins Transport, Inc., a Florida corporation owned and operated by Maria and Eugene Martins, is in the business of transporting automobiles using large auto transporters, each of which consists of a tractor and a trailer and can transport a total of eight stacked vehicles at one time.  (Doc. No. 33, filed Mar. 15, Ex. D, Martins Depo., pp. 17–19).  The company transports automobiles on behalf of auto dealers and generally moves such vehicles between dealerships and auto auction locations or between two dealerships.  (*Id.* at 21–22).  Transporters are loaded

---

[1]  The pertinent facts are undisputed by the parties.

by driving vehicles into the trailer through the use of moveable ramps which allow the stacking of cars; there are no wenches or other means to load the vehicles other than by their own power. (*Id.* at 19, 33).  Automobiles transported on a trailer do not require license tags; however, from time to time a Martins driver will drive a customer's automobile individually rather than load it onto the transporter, in which case a transport tag is affixed to the vehicle for such purpose.  (*Id.* at 27–28).

### The Underlying Accident

Ordinarily, picking up a car at an auction requires the transport driver to enter through a security gate, receive the vehicle's paperwork from a guard at the gate, locate the vehicle, and drive it back through the security gate for loading onto the transporter.  (Doc. No. 33, Ex. D, Martins Depo., p. 43).  The key is usually left in the ignition of a car which is parked within the secured confines of the auction.  (*Id.* at 35–36).  The "number one problem" encountered by drivers in picking up vehicles for transportation is the failure to start due to dead batteries.  (*Id.* at 35).  Each transport driver carries a "jump start box" for use on these occasions; however, the auctions employ personnel to drive "jump carts" in order to provide additional assistance.  (*Id.*; Doc. No. 31, filed Mar. 15, 2005, Ex. C, Cleek Depo., p. 10).

In June 2001, Martins Transport was hired by Lussier Motor Sports, an auto dealer, to pick up a 1974 Corvette from the transport parking lot at the Florida Auto Auction ("Auction"). (Doc. No. 33, Ex. D, Martins Depo., p. 65).  This particular job differed from others at the Auction to the extent that the vehicle had been dropped off at that location by another transporter and was to be picked up directly by Martins Transport.  (*Id.* at 65–66).  The vehicle was not brought through the security gate and parked inside with other cars to be sold at auction; instead,

it was parked in an outside lot which served as a "drop off and pick up point." (*Id.* at 66; Doc. No. 31, Ex. B, Rivera Depo., p. 20).

Martins Transport's driver Edgardo Rivera was dispatched to the Auction to pick up the Corvette on June 24, 2005. (Doc. No. 31, Ex. B, Rivera Depo., pp. 17, 18). Rivera had difficulty starting the car; he testified that the engine would turn on but would not continue to run for long even with the use of jumper cables. (*Id.* at 18, 20). After attempting for approximately thirty minutes to keep the car running with the help of other transport drivers and Auction employees, Rivera decided to leave the car in the parking lot. He put its key in a sealed envelope which he left inside the Auction's guard station. (*Id.* at 19, 21–22, 31).

On June 25, 2005, Rivera was again dispatched to the Auction to pick up two other vehicles within the secured parking area. (*Id.* at 16, 46). While in the process of removing these cars from inside the Auction, Rivera received a phone call from Maria Martins directing him to attempt once again to transport the Corvette. (*Id.* at 16). Rivera picked up the key, still in the sealed envelope, from the guard station and then found the Corvette in the same place in which he had left it the day before. (*Id.* at 20–21). The auto transporter was parked approximately 600 to 700 feet away from the Corvette, and its ramps were down.[2] (*Id.* at 46, 48). Rivera connected his own battery charger to the car's battery[3] and tried to start the car for approximately five minutes with no success. (*Id.* at 30). He then asked a passing Auction employee to call for the assistance of a jump cart. (*Id.* at 27).

---

[2] Rivera testified that after the accident he returned to the transporter, put the ramps up, and waited to give his report to the fire marshal. (Doc. No. 31, Ex. B, Rivera Depo., p. 48).

[3] The battery in the 1974 Corvette was located inside the passenger compartment of the car behind the driver's seat. (Doc. No. 31, Ex. B, Rivera Depo., p. 33).

About fifteen to twenty minutes later, Carol Cleek, a jump cart driver employed by the Auction, arrived and drove her jump cart to the front of the Corvette.  (*Id.* at 30, 32; Doc. No. 31, Ex. C, Cleek Depo., p. 10).  Rivera instructed Cleek to back the cart up to the rear of the Corvette, and when she did so, Rivera took the jumper cables from the back of the cart before she exited the cart and connected them to the car's battery.  (Doc. No. 31, Ex. B, Rivera Depo., p. 33; Ex. C, Cleek Depo., p. 22).  As Rivera was leaning into the car from the driver's side to hold the cables to the battery, he asked Cleek to walk around the car and turn the ignition, which she did by leaning into the car through the passenger-side door.  (Doc. No. 31, Ex. B, Rivera Depo., p. 33; Ex. C, Cleek Depo., p. 24).  When Cleek turned the key, the engine started but was "racing" and running very loudly and roughly.  (Doc. No. 31, Ex. B, Rivera Depo., p. 34; Ex. C, Cleek Depo., p. 24).  Rivera motioned to Cleek to turn the motor off, and when she complied, the car backfired and caught fire, causing Cleek severe burns.  (Doc. No. 31, Ex. C, Cleek Depo., pp. 25–26, 36).

On August 10, 2001, Cleek sued Martins Transport in Florida state court under the theory of vicarious liability for Rivera's alleged negligence in attempting to start the Corvette, based in part on the belief that Rivera had poured gasoline into the car's carburetor as one method to get the engine running.  (Doc. No. 40, Ex. A, Hahn Decl., Ex. 1, Cleek Complaint).

***Martins Transport's Insurance Policies***

At the time of the accident, Martins Transport had two liability insurance policies in effect.[4]

---

[4]  As discussed in the Analysis section, *infra*, both policies were in effect from January 14, 2001, to January 14, 2002, and unless otherwise noted, all references to the National

(continued...)

-4-

The first policy, issued by Plaintiff Monticello Insurance Company, was a General

Liability policy which provided coverage in part as follows:

> [Monticello] will pay those sums that the insured becomes legally obligated to pay as
> damages because of bodily injury or property damage to which this insurance applies.
> [Monticello] will have the right and duty to defend the insured against any suit seeking
> those damages.  However, [Monticello] will have no duty to defend the insured against
> any suit seeking damages for bodily injury or property damage to which this insurance
> does not apply.

(Doc. No. 40, Ex. A, Hahn Decl., Ex. 3, Monticello Policy, Sec. I(A)(1)(a)).  The policy

contained the following exclusion:

> This insurance does not apply to:
> ...
> Bodily injury or property damage arising out of the ownership, maintenance, use or
> entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or
> loaned to any insured.  Use includes operation and loading or unloading. [Auto
> Exclusion].

(*Id.*, Sec. I(A)(2)(g)).

The second policy, issued by Defendant National Casualty Company, was a Commercial

Auto policy and provided in part:

> [National Casualty] will pay all sums an insured legally must pay as damages because of
> bodily injury or property damage to which this insurance applies, caused by an accident
> and resulting from the ownership, maintenance or use of a covered auto.
> ...
> This insurance does not apply to any of the following:
> ...
> Bodily injury or property damage resulting from the handling of property:
> a.  Before it is moved from the place where it is accepted by the insured for movement
> into or onto the covered auto.... [Handling of Property Exclusion].

---

[4](...continued)
Casualty policy are made to the policy as amended by Endorsement 2 on January 23, 2004.
(Doc. No. 40, Ex. A, Hahn Decl., Ex. 3, Monticello Policy; Ex. C, National Casualty Policy).

(Doc. No. 40, Ex. C, National Casualty Policy, Sec. II(A), (B)(7) (internal quotation marks omitted)).  The policy listed as covered autos owned by Martins Transport two tractors, two trailers, and a transporter plate.[5]  (*Id.*, Schedule of Covered Autos).  On March 12, 2001, the policy was amended to add coverage for "nonowned autos" which are defined as

> Only those autos you do not own, lease, hire, rent or borrow that are used in connection with your business.  This includes private passenger type autos owned by your employees, partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs.

(*Id.*, Endorsement 1, Sec. I(A) (internal quotation marks omitted)).

Upon learning of Cleek's lawsuit, Maria Martins submitted a claim with her insurance broker, Oswald, Trippe and Company, through whom she had purchased commercial insurance policies on behalf of Martins transport.[6]  (Doc. No. 33, Ex. D, Martins Depo., p. 71, 85).  After investigating Cleek's allegations, National Casualty determined that the claim fell outside the scope of coverage provided by Martins Transport's Commercial Auto policy and tendered defense of Cleek's lawsuit to Monticello as the company's General Liability carrier.  (Doc. No. 40, Ex. A, Hahn Decl., Ex. 2, National Casualty's Dec. 5, 2001, Letter).  Monticello undertook the defense of Martins Transport against Cleek's claims but reserved its right to deny coverage for indemnification of any judgment, based on the language of the General Liability policy's

---

[5]  It is undisputed that the transporter driven by Rivera on the day of the accident was comprised of a tractor and trailer, both of which were listed on the "Schedule of Covered Autos You Own."  (Doc. No. 40, Ex. C, National Casualty Policy).  It is also undisputed that the transporter plate was not affixed to the Corvette at the time of the accident.  (Doc. No. 33, Ex. D, Martins Depo., pp. 84–85).

[6]  It is apparent though not explicitly stated in the record that Oswald, Trippe and Company initially filed Martins Transports' claim with National Casualty for coverage under the Commercial Auto policy.

Auto Exclusion.  (*Id.*, Ex. 4, Monticello's May 16, 2003, Letter).  Monticello then attempted to tender defense and indemnity of the suit to National Casualty and urged National Casualty to reconsider its position on the issue of coverage under the Commercial Auto policy.  (*Id.*, Ex. 5, Monticello's May 20, 2003, Letter; Ex. 6, Monticello's June 11, 2003, Letter).  National Casualty declined to change its determination as to coverage and refused to contribute to the defense of Martins Transport.[7]  (*Id.*, Ex. 7, National Casualty's July 18, 2003, Letter).

After expending approximately $80,000 in defending the suit on behalf of Martins Transport, Monticello reached a settlement agreement with Carol Cleek before trial and paid her $900,000 in damages.  (Doc. No. 40, Ex. A, Hahn Decl., ¶¶ 7–8).  In exchange for Monticello's agreement to settle the lawsuit, Martins Transport assigned to Monticello its rights as to Cleek's claims under the 2001–02 National Casualty policy.  (*Id.*, Ex. 8, Assignment of Rights).  Pursuant to this assignment of rights, Monticello initiated the instant lawsuit against National Casualty, seeking indemnification for the $900,000 Cleek settlement as well as $80,000 in defense costs, under theories of breach of the Commercial Auto policy, subrogation, equitable subrogation, and statutory entitlement to attorney's fees.  (Doc. No. 1, filed Oct. 22, 2003).

Both parties now move the Court for summary judgment in their favor.  (Doc. No. 30; Doc. No. 40).  On June 10, 2005, the Court held a hearing at which both parties were represented.  (Doc. No. 68, filed Jun. 13, 2005).

---

[7]  Maria Martins testified that she was unaware which of the two insurers defended her company's interests in the Cleek suit.  (Doc. No. 33, Ex. D, Martins Depo., pp. 79–80).

**Standard of Review**

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.* The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then a court must not grant summary judgment. *Id.* (citation omitted).

**Analysis**

This case is properly before the Court pursuant to its diversity jurisdiction as granted by 28 U.S.C. § 1332. The parties agree that Florida law governs the interpretation of the insurance policies at issue as well as all rights and duties arising therefrom. (Doc. No. 58, p. 12).

*Amendment to the National Casualty Policy*

A significant portion of the National Casualty policy, Truckers Coverage Form CA 00 12 07 97 which contains the pertinent coverage and exclusion language quoted *supra*, was inserted into the policy on January 23, 2004, after the accident which injured Carol Cleek had occurred and after the instant litigation was commenced. (Doc. No. 40, Ex. C, National Casualty Policy, Endorsement 2). The form allegedly was "inadvertently left off at inception" of the policy by the issuing agent. (*Id.*; Doc. No. 33, Ex. B, Sansoucy Depo., p. 47). Monticello argues in its motion for summary judgment that National Casualty should not be permitted to rely on the "handling of property" exclusion because its insured, Martins Transport, did not have the opportunity to review Form CA 00 12 07 97 and was not on notice of such exclusion.[8] (Doc. No. 40, pp. 12–14).

In undisputed deposition testimony, National Casualty's underwriter Deborah Sansoucy stated that the initial Commercial Auto policy written by National Casualty for Martins Transport prior to the 2001–02 policy period and those policies subsequent to such period contained the same Truckers Coverage Form. (Doc. No. 33, Ex. B, Sansoucy Depo., p. 49). Moreover, the original 2001–02 policy reflects a number of references to the absent Truckers Coverage Form. The Truckers Coverage Form Supplemental Declarations page states that "[a]utos are shown as covered autos for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the *Truckers Coverage Form*...,"and a footnote to

---

[8] Maria Martins testified that although she probably reviewed the 2001–02 renewal policy, "I have gone through so many rewrites with Oswald, Trippe and Company that I no longer know how many policies I have had and policy numbers." (Doc. No. 33, Ex. D, Martins Depo., p. 63). She stated that she explained to her broker what kind of coverage the business needed, but she "never paid attention to the printing" of the policies. (*Id.* at 89).

the Covered Autos column heading on the same page reads "Entry of one or more of the symbols from the Covered Autos Section of the *Truckers Coverage Form* shows which autos are covered autos." (Doc. No. 40, Ex. A, Hahn Decl., Ex. 9, Original National Casualty Policy (emphasis added)). Additionally, the March 12, 2001, amendment added to the Supplemental Declarations page liability for Covered Auto Symbols "47 and 50." (*Id.*, Endorsement 1). Only by reference to the missing Truckers Coverage Form is it possible to ascertain that symbols 47 and 50 mean "Hired Autos Only" and "Nonowned Autos Only," respectively. In the absence of Form CA 00 12 07 97, such symbols would be undefined and therefore would have no meaning to the policy.

Monticello further contends that Endorsement 2 amounted to a material alteration of the policy which can have no effect with regard to an accident which occurred prior to amendment. (Doc. No. 40, p. 13). To be effective, the acceptance of a modification to an insurance contract must precede the loss. *See Sec. Ins. Co. of Hartford v. Baad*, 657 So. 2d 10, 10 (Fla. 3d DCA 1995). Sansoucy testified that "[t]he Truckers Coverage Form is the essence of an auto policy in many ways. It states the insuring agreement, it states definitions, it states exclusions, it states who is an ensured [sic], et cetera." (Doc. No. 33, Ex. B, Sansoucy Depo., p. 52). In fact, the coverage provision pertaining to liability "resulting from the ownership, maintenance or use of a covered auto," on which Monticello relies in asserting that National Casualty is responsible for indemnification for Cleek's injuries, was not included in the policy as originally issued but was itself contained in Form CA 00 12 07 97 and added to the policy through the amendment effected by Endorsement 2. (Doc. No. 40, Ex. A, Hahn Decl., Ex. 9, Original National Casualty Policy; Ex. C, National Casualty Policy, Endorsement 2, Sec. II(A)).

Monticello cannot have it both ways.  If the provisions of the Truckers Coverage Form were not in effect at the time Carol Cleek suffered her injuries, the Court would have no exclusion for the "handling of property" to consider, nor would it have any definition of coverage on which to base a finding of liability on the part of National Casualty.  The Court agrees with Monticello that the contents of Form CA 00 12 07 97 are material to the policy but disagrees with the assertion that Endorsement 2 constituted a material *alteration* of the policy. Without the inclusion of the Form, the entire policy would be rendered meaningless. Accordingly, the Court finds that the Truckers Coverage Form as inserted into the National Casualty policy by the January 2004 endorsement after its inadvertent omission was an effective part of the 2001–02 policy and was in force at the time of the underlying accident.

### National Casualty's Coverage of the Auto Transporter

It is well settled under Florida law that insurance contracts are to be interpreted in accordance with their plain language.  *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003).  Where a policy provision is susceptible to more than one reasonable interpretation, it is considered ambiguous and must be construed in favor of the insured and strictly against the insurer as the drafter of the contract.  *Id.* (citing *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000); *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)).  Thus, clauses affording coverage are construed broadly to provide the greatest amount of coverage, while exclusionary clauses which limit coverage are interpreted narrowly.  *Westmoreland v. Lumbermans Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA 1997).

Whether an ambiguity exists in an insurance contract is a question of law to be determined by the Court.  *Escobar v. United Auto. Ins. Co.*, 898 So. 2d 952, 954 (Fla. 3d DCA 2005).  However, as the Supreme Court of Florida has consistently held,

> Only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite.  It does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties.

*Swire*, 845 So. 2d at 165 (quoting *Pridgen*, 498 So. 2d at 1248 (quoting *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1972))).  Moreover, "simply because a provision is complex and requires analysis for application, it is not automatically rendered ambiguous."  *Id.* (citing *Eagle Am. Ins. Co. v. Nichols*, 814 So. 2d 1083, 1085 (Fla. 4th DCA 2002)).

## Coverage Clause: Use of a Covered Auto

The National Casualty Commercial Auto policy provides coverage for bodily injury "caused by an accident and resulting from the ownership, maintenance or *use* of a covered auto."[9]  (Doc. No. 40, Ex. C, National Casualty Policy, Sec. II(A)).  In the instant litigation, National Casualty concedes that Florida courts have interpreted the term "use" of an automobile to include the process of loading and unloading the vehicle;[10] however, it contends that the actions taken by Rivera and Cleek at the time of the underlying accident did not constitute

---

[9]  The parties do not dispute that the facts alleged in the Cleek lawsuit satisfy the meanings of the terms "bodily injury" and "accident" under the policy.

[10]  During the pendency of the underlying Cleek litigation, National Casualty took the position that this provision does not extend to the loading or unloading of a covered auto because the policy "does not expressly provide coverage for 'loading and unloading,'" unlike many other automobile insurance policies.  (Doc. No. 40, Ex. A, Hahn Decl., Ex. 6, National Casualty's July 18, 2003, Letter).

"loading" of the covered auto transporter as defined under Florida law.  (Doc. No. 32, p. 4).  In

contrast, Monticello argues that the actions of Rivera and Cleek were essential steps in the

process of loading the Corvette onto the auto transporter.  (Doc. No. 45, p. 5).

Florida courts follow the "complete operations" doctrine in determining whether the facts

of a given case fall within the meaning of "loading and unloading."  *General Accident Fire &

Life Assurance Corp. v. Liberty Mut. Ins. Co.*, 260 So. 2d 249, 255 (Fla. 4th DCA 1972).  Under

this approach, loading and unloading of an automobile "is generally held to cover the entire

process involved in the movement of the goods *from the moment when they are given into the

insured's possession* until they are turned over at the place of destination to the party to whom

delivery is to be made."  *Id.* at 251.  A causal relationship must exist between the use (i.e.

loading or unloading) of the auto and the injury to be covered.  *Id.*  However, the insured vehicle

itself need not be involved in the accident, and it need not be the cause of the accident.

*Fireman's Fund Ins. Co. v. Canal Ins. Co.*, 411 F.2d 265, 269 (5th Cir. 1969).

In *General Accident*, the insured was hired to deliver ready mixed concrete to a

construction site.  260 So. 2d at 250.  An employee of the insured emptied the concrete from the

covered truck into the bucket of a crane owned and operated by the owner of the building.  *Id.*

After the bucket had been filled, the crane operator began to transport its contents to the top of

the building and in doing so injured another worker on the site.  *Id.*  Faced with the question of

whether the injury resulted from the unloading of the insured's truck, the Court looked to who

had possession and control of the concrete at the time the accident occurred.  The Court reasoned

that the insured's employee had completed delivery of the concrete when the crane bucked had

been filled and that from that moment forward, the crane operator took exclusive control and

possession of the concrete. *Id.* at 254. Because the insured's employee did not direct the movement of the concrete or make decisions concerning its "destination or place of ultimate use," the unloading process was complete and the use of the covered truck was not an "efficient and predominating cause or substantial factor" in the accident. *Id.*

In the instant case, National Casualty argues that the rationale of the *General Accident* Court necessitates a finding that the accident involving the 1974 Corvette did not result from the use of the auto transporter because Rivera had not taken exclusive possession and control of the Corvette. (Doc. No. 32, pp. 5–6). The Court disagrees. On the day of the accident, Rivera was making his second attempt to start the Corvette in order to drive it onto the auto transporter. He retrieved the key to the vehicle, still in its sealed envelope, from the Auction's guard station, put the key in the ignition of the car, and attempted to start the engine. When the car would not start with the help of his own jump start box, Rivera requested the assistance of a jump cart. The Court is unpersuaded by National Casualty's argument that the appearance of Carol Cleek and her actions in assisting Rivera operated to divest Rivera of the possession and control he exercised over the Corvette. The record evidence is undisputed that Rivera directed Cleek where to position her cart, he grabbed the jumper cables from the cart and connected them to the car's battery, he asked her to lean into the car from the passenger side and turn the ignition, and he signaled to her to turn the engine off. Thus, all actions taken by Cleek in assisting Rivera were performed under Rivera's direction after he had possession of the Corvette on behalf of Martins Transport for the purpose of loading it onto the auto transporter.

National Casualty further contends that Rivera had not begun the loading process because the Corvette had not been moved at the time it caught fire. (Doc. No. 32, pp. 4–5). In *Canal*, the

former Fifth Circuit Court of Appeals predicted without benefit of Florida case law that Florida courts would hold that "loading" should cover "all the steps that are an integral part of the complete operation of transferring the articles, goods, or other things to be conveyed, onto the insured vehicle...."  411 F.2d at 268.  The *Canal* Court considered the coverage of the insured's vegetable truck as it stood backed up to a loading platform awaiting snow ice to be dispensed into its trailer.  *Id.* at 267.  As a block of ice was being moved toward the snow machine but before it had moved through the machine to be converted to snow ice and sprayed into the trailer, the block of ice fell and injured the owner of the truck.  *Id.*  Although the Court stated that "[l]oading begins when the object to be loaded leaves its original location and starts toward the insured vehicle...," it went on to reason that "from the time the block[] of ice had been set apart to fill [the insured's] order..., *if not before*, an integrated loading operation" had begun.  *Id.* at 269.

There is no evidence in the record in the instant case that the Corvette left its original location.[11]  However, the evidence indicates that the *only* method for loading a vehicle onto the auto transporter was to drive it by its own power.  Rivera had no means by which to pull or push the Corvette onto the transporter; loading required him to start the car.  Therefore, the efforts of Rivera and Cleek in attempting to start the Corvette's engine were an essential part of the integrated loading operation.[12]  The Court finds that the insuring provision of the National Casualty policy provides coverage for the injuries suffered by Cleek caused by the underlying

---

[11]  The Court will address this issue further in its discussion of the Handling of Property Exclusion, *infra*.

[12]  Moreover, under *General Accident*, a Florida appellate opinion issued subsequently to the decision in *Canal*, the loading process is defined to begin "from the moment when [the goods to be loaded] are given into the insured's possession...."  260 So. 2d at 251.

accident resulting from the use of the covered auto transporter.  The Court now turns to the
policy's Handling of Property Exclusion.

*Handling of Property Exclusion: the Auto Transporter as Covered Auto*

The Commercial Auto policy excludes from coverage bodily injury "resulting from the
handling of property...[b]efore it *is moved from the place where it is accepted* by the insured for
movement into or onto the covered auto...."  (Doc. No. 40, Ex. C, National Casualty Policy, Sec.
II(B)(7)).  National Casualty argues that this exclusion applies in the instant case because the
Corvette did not move during Rivera's attempts to start it for loading onto the covered auto
transporter.  (Doc. No. 32, pp. 6–7; Doc. No. 43, pp. 5–6).  Monticello counters that the critical
terms "moved" and "place where it is accepted" are undefined in the policy and are susceptible
to more than one reasonable meaning.  (Doc. No. 40, pp. 9–12; Doc. No. 45, pp. 10–12).

"The lack of a definition of an operative term in a policy does not necessarily render the
term ambiguous and in need of interpretation by the courts."  *Swire*, 845 So. 2d at 166 (quoting
*State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998)).  Where a
particular term in an insurance policy is not defined, it must be accorded its ordinary meaning
"in light of the skill and experience of ordinary people, and given [its] everyday meaning as
understood by the man on the street."  *Hyman v. Nationwide Mut. Fire Ins.*, 304 F.3d 1179, 1188
(11th Cir. 2002) (quoting *Thomas v. Prudential Prop. & Cas.*, 673 So. 2d 141, 142 (Fla. 5th
DCA 1996) (internal quotation marks omitted)).  Moreover, although exclusionary clauses are to
be strictly construed in favor of coverage, where the insurer has stated clearly what is excluded
from coverage, the Court "may not ignore the plain meaning of the words employed in order to
contort clarity into ambiguity."  *Westmoreland*, 704 So. 2d at 180.

The primary definition of "move" found in Webster's Dictionary is "to go or pass from one place to another with a continuous motion." *Webster's Ninth New Collegiate Dictionary*, 776 (1986). In addition, definitions of the transitive form of the verb, which form is employed by the clause at issue, include "to change the place or position of," "to dislodge or displace from a fixed position," and "to transfer...from one position to another." Although Webster's also includes the definition "to cause to operate or function," such alternative is not applicable to the policy exclusion under consideration because of the modifying words "from the place" which follow the word "moved" in that provision.

Monticello also suggests that Rivera was in the process of moving the Corvette, thus making the exclusion inapplicable. (Doc. No. 45, p. 11). However, unlike "loading," which indicates an ongoing process and, as discussed *supra*, includes all steps essential to the complete operation, "is moved" does not imply a process or preparations or an intent to move. Instead the phrase indicates that the action of moving must in fact have already begun. Interpreting the policy according to its plain meaning as understood by the "man on the street," it is clear that the Handling of Property Exclusion requires the *displacement from a fixed position* of property to be loaded onto the auto transporter as the covered auto before coverage is afforded. Monticello points to no evidence in the record that Rivera changed the position of the Corvette from one place to another.

Furthermore, the Court is unpersuaded that "place where it is accepted" is insufficiently clear so as to preclude the exclusion's application in this case. Monticello argues that the "place" to which the policy refers could be the spot in which the Corvette was parked or the Auction parking lot in which it was located. (Doc. No. 40, pp. 10–11). Assuming *arguendo* that

the term is ambiguous, the Court must attribute to it its most narrow reasonable interpretation because it is contained in a provision which limits coverage under the policy. The Court is not required to nullify the exclusion in its entirety. Thus, the "place where it is accepted" should be interpreted as the parking space in which the property is located at the time Martins Transport accepts it for movement onto its auto transporter. Because the Corvette was not displaced to any degree, no matter how small, from the space in which it was parked when Rivera accepted the key and began his attempts to start it, the Handling of Property Exclusion applies.

Monticello next argues that such an interpretation would create a gap in coverage between the time Martins Transport takes possession of a vehicle and the moment it is successful in physically moving the vehicle from its place, a period during which a substantial amount of the company's work occurs. (Doc. No. 40, pp. 10–12; Doc. No. 45, pp. 12–13). Monticello suggests that coverage under the Commercial Auto policy should begin at the point that the insured's risk attaches as bailee of the property, that is when Martins Transport is in custody of the property. (Doc. No. 40, p. 10). However, as the Eleventh Circuit recently stated, "Florida courts do not look behind unambiguous policies in search of countervailing rationales." *Sphinx Int'l Inc. v. Nat'l Union Fire Ins. Co.*, 2005 WL 138923 (11th Cir. June 14, 2005). Moreover, Florida law does not permit consideration of the reasonable expectations of the parties to an insurance contract. *Deni Assoc. of Fla., Inc. v. State Farm & Cas. Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998). Finally, Monticello's opinion as to what risks the policy *should* have been drafted to cover is immaterial.[13] Because the Court has already determined that the phrase "is

---

[13] The Court notes that there are legitimate reasons why an insurer like National Casualty would want to limit its exposure through an exclusionary clause such as the Handling of

(continued...)

-18-

moved" is unambiguous, Monticello's argument that the exclusion does not apply to the effort of Rivera to move the Corvette onto the auto transporter, the covered auto, fails.

**_National Casualty's Coverage of the Corvette as a Nonowned Auto_**

Monticello argues that if coverage for Cleek's injuries is not appropriate as to the loading and unloading of the auto transporter, then National Casualty is nevertheless liable for indemnification for the settlement because the 1974 Corvette was a "nonowned auto" as defined by Section I(A) and added to the policy for coverage by Endorsement 1.  (Doc. No. 40, pp. 14–18).

<u>Amendment of the Pleadings</u>

As an initial matter, National Casualty contends that allowing Monticello to proceed under this theory of coverage would be tantamount to allowing it to amend its pleadings long after the deadline for such amendments has expired.[14]  (Doc. No. 32, p. 7–9).  During the pendency of the underlying Cleek litigation, Monticello wrote a letter to National Casualty in an effort to convince the latter to reconsider its denial of coverage of Martins Transport's claim.  In that letter, Monticello asserted,

> Coverage under National Casualty's Policy does not turn upon whether the Corvette is a "covered auto."  The Corvette is merely cargo, that happens to be an automobile, which was in the policyholder's custody and which the policyholder was loading onto a "covered auto."

(Doc. No. 40, Ex. A, Hahn Decl., Ex. 6, Monticello's June 11, 2003, Letter).

---

[13](...continued)
Property Exclusion.  Where its insured deals regularly with used vehicles of unknown history which often have difficulty starting, it is not surprising that the insurer would seek to confine its risk to the movement of vehicles.

[14]  The Amended Case Management and Scheduling Order reflects that the deadline for amendment of the pleadings was April 15, 2004.  (Doc. No. 20, filed Dec. 16, 2004).

Monticello's Complaint in the instant litigation, filed on October 22, 2003, alleges that the auto transporter was a covered vehicle under the National Casualty policy and further alleges under Count I (Breach of Contract) that "[t]he loss alleged in the *Cleek* Complaint was caused by an accident resulting from the use of the Martins Tranport auto transporter...."  (Doc. No. 1, ¶¶ 7, 30).  However, reference is made to Rivera's work on the Corvette throughout the Complaint, and under Count II (Subrogation), the Complaint alleges that National Casualty was Martins Transport's "primary commercial auto liability carrier for, *inter alia*, motor vehicle claims" and that "National Casualty is obligated to defend and indemnify Martins Transport for all motor vehicle claims that are covered pursuant to" the policy.  (*Id.* at ¶¶ 13–14, 18, 35, 37).  Under the "notice pleading" standard applied by the federal courts, a plaintiff need only state "a short and plain statement of the claim showing that the pleader is entitled to relief...."  *Fed. R. Civ. P.* 8(a)(2).  Monticello has satisfied this standard.

Moreover, the parties have stipulated that Monticello was not provided with a copy of the inadvertently omitted Truckers Coverage Form, inserted into the policy by Endorsement 2,[15] until after the commencement of the instant litigation, long after the above referenced letter was written.  (Doc. No. 58, p. 12).  Further, National Casualty is presumed to know every provision of the policies it issues and could have foreseen that Monticello might develop an alternate theory of recovery under any provision of Martins Transport's policy.  Even if such foresight was not possible, Monticello asserts that National Casualty was put on notice of the developing theory of the Corvette as a covered auto as early as January 2005, when after receiving a copy of

---

[15]  See discussion relating to the January 23, 2004, amendment of the Commercial Auto policy, *supra*.

the Endorsement Monticello explored this possibility during several depositions.  (Doc. No. 45, p. 15).  National Casualty does not dispute this assertion.  Monticello further points out that National Casualty even sought to preempt Monticello from raising this issue by asking the Court to refuse consideration of it in Monticello's anticipated response to National Casualty's own motion for summary judgment filed on March 15, 2005.  (Doc. No. 32).

The allegations contained in Monticello's Complaint do not explicitly limit themselves to issues relating to the auto transporter as a covered vehicle to the exclusion of any other theory of recovery under the Commercial Auto policy.  The Complaint seeks recovery against National Casualty based on the provisions of its policy.  The question of whether the "nonowned auto" provision applies to the Corvette in the instant case is not an additional claim for relief under a new theory of law not pled in the Complaint.  It is an alternate theory of recovery based on the provisions of the same policy and the application of the law to the *facts* of the case as they have been developed through the discovery process.  This does not require amendment of the pleadings.  The Court will consider the application of the "nonowned auto" provision to the Corvette.

National Casualty further argues that if the Court is disposed to consider this theory, National Casualty should be permitted to amend its own pleadings in order to assert additional affirmative defenses.  (Doc. No. 32, p. 9).  National Casualty contends that it agreed to the addition of "nonowned auto" coverage to Martins Transport's Commercial Auto policy on the representation by Maria Martins in the application for such coverage that the company uses no nonowned autos in its business.  (Doc. No. 43, p. 9).  Ms. Sansoucy testified that the amended policy would not have been issued as written if the "nonowned auto" provision was to be

interpreted to apply to every vehicle transported by Martins Transport.  (Doc. No. 33, Ex. B, Sansoucy Depo., pp. 178–82).  Thus, National Casualty believes that the evidence would support rescission of the policy based on Martins' alleged misrepresentations.

However, National Casualty conceded during the June 10, 2005, hearing that rescission of the 2001–02 Commercial Auto policy would result in Martins Transport's being exposed and uninsured for any claims under the policy which accrued during the policy period but have not yet been asserted.  Although Monticello stands in the shoes of Martins Transport for the purposes of Carol Cleek's injuries, it does not represent Martins Transport with regard to any other possible exposure under the National Casualty policy.

National Casualty should have been on notice of the possibility of the coverage of the Corvette becoming an issue in this litigation at least as early as January 2005 if not before. Based on its knowledge of its own policy, it should have requested leave to amend its affirmative defenses at an earlier time instead of waiting until discovery had closed and the case was near trial.  Because the interests of Martins Transport would be unrepresented if National Casualty were permitted to proceed with the rescission defense, because it is too late in the instant litigation to join that company as a party, and because it failed to assert the affirmative defenses in a timely manner, the Court denies National Casualty's request to amend its affirmative defenses.

<u>Construction of the Non-Owned Auto Provision</u>

The "nonowned auto" provision, also called "garage keeper's liability" by Maria Martins (Doc. No. 33, Ex. D, Martins Depo., pp. 51, 89, 93, 96), provides coverage for "those autos you do not own, lease, hire, rent or borrow that are used in connection with your business." (Doc. No. 40, Ex. C, National Casualty Policy, Sec. I(A)). By itself, there is little dispute that this sentence encompasses the 1974 Corvette which Rivera attempted to start for loading onto the auto transporter. The car was not owned, lease, hired, rented or borrowed by Martins Transport but was entrusted to the company by its customer, Lussier Motor Sports, so that it could be transported from the Auction to a dealership, a use in connection with Martins Transport's business.

Deborah Sansoucy testified that cars such as the Corvette, which are picked up for transportation by Martins Transport, are not covered autos but are cargo. (Doc. No. 33, Ex. B, Sansoucy Depo., p. 184). Therefore, National Casualty argues, the cars are not "used *in connection with*" the company's business. (Doc. No. 43, p. 10). Putting this argument another way, National Casualty seems to contend that the Corvette was *an object of* Martins Transport's business rather than a *tool for carrying out* the business. This interpretation is a reasonable one.

On the other hand, Maria Martins testified that she purchased this additional coverage as an amendment to the Commercial Auto policy, at the insistence of Florida Auto Auction, so that her business would be covered for any exposure to liability during the time her transport drivers worked on cars they were dispatched to pick up. (Doc. No. 33, Ex. D, Martins Depo., p. 89). While it is true that the expectations of the parties are irrelevant under Florida law in the context

-23-

of insurance contracts, as stated *supra*, this testimony brings to light another reasonable

interpretation in addition to that proffered by National Casualty.  Thus the phrase "use in

connection with your business" could mean use of the vehicles the insured attempts to transport,

Thus the phrase is susceptible to differing interpretations.  Under the law governing an

ambiguity in an insurance contract, the Court must construe the provision broadly in favor of

coverage for the insured.  Therefore, this provision would make the Corvette a covered auto.

However, National Casualty argues that such coverage is restricted by the second

sentence of the "nonowned auto" definition which provides:

> This includes private passenger type autos owned by your employees, partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs.

(Doc. No. 40, Ex. C, National Casualty Policy, Sec. I(A) (internal quotation marks omitted)).

National Casualty urges the Court to construe this subsequent sentence to limit nonowned autos

to mean only those owned by Martins Transport's employees.  Because, as the parties stipulated

at the June 10, 2005, hearing, the Corvette was not owned by Rivera, National Casualty contends

that no coverage exists under this clause for the accident which caused Cleek's injuries.

The word "include" is defined as follows:

> To contain as a part of something.  The participle *including* typically indicates a partial list....  But some drafters use phrases such as *including without limitation* and *including but not limited to* — which mean the same thing.

*Black's Law Dictionary* 766 (7th ed. 1999); *see also Alligator Enters., Inc. v. Gen. Agent's Ins.*

*Co.*, 773 So. 2d 94, 95 (Fla. 5th DCA 2000) (quoting same definition from *Black's Law*

*Dictionary* in addition to *The American Heritage Dictionary* (2d ed.) ("'*Include*' is used most

appropriately before an incomplete list of components: *The ingredients of the cake include butter*

*and egg yolk*."));  *Pekin Ins. Co. v. Benson*, 714 N.E.2d 559, 563 (Ill. App. Ct. 1999) (in similar

"nonowned auto" clause, second sentence "constitute[d] an amplification or illustration of the

general definition.").  In light of this ordinary, everyday definition, the second sentence, which

begins "[t]his includes," is unambiguous.   Clearly autos owned by the company's employees fall

within the category of "nonowned autos" which are covered by the National Casualty policy, but

the category is not limited to such autos.

National Casualty cites a number of cases which state that the purpose for "nonowned

auto" coverage in insurance policies "is to provide coverage to the insured while engaged in

infrequent or casual use of an automobile other than one described in the policy."  *Lancer Ins.*

*Co. v. Gomez*, 799 So. 2d 334, 336 (Fla. 3d DCA 2001) (coverage not applicable under

nonowned auto clause because vehicle in question was used on an everyday basis); *U. S. Sugar*

*Corp. v. Nationwide Mut. Ins. Co.*, 475 So. 2d 1350, 1352 (Fla. 2d DCA 1985) (driver covered

under his individual auto liability policy for accident which occurred while driving his

employer's car for personal business); *Henigson v. Davis*, 305 So. 2d 86, 88 (Fla. 4th DCA

1974) (considering question of *who* was an insured driver under the policy, not whether a vehicle

was covered).  These cases are not directly on point and cannot be used as precedent under the

facts of this case to support the position that the "nonowned auto" provision in National

Casualty's policy does not afford coverage for the accident involving the Corvette.

National Casualty further relies on the canon of construction "*expressio unius est*

*exclusio alterius*," which means that the enumeration of one thing implies the exclusion of the

other.  *See, e.g.*, *Mason v. Fla. Sheriff's Self-Ins. Fund*, 699 So. 2d 268, 270 (Fla. 5th DCA

1997).  However, this rule applies where a list of specific items is not preceded by the word

"include" or its operative equivalent.  *See, e.g.*, *id.* at 269 (rape not a covered act where policy

provided coverage for "damages because of *claims for* false arrest, assault and battery, false

imprisonment, malicious prosecution...").  Nevertheless, assuming for the purposes of argument

that National Casualty's reading is reasonable and that the "nonowned auto" provision is limited

to cars driven by Martins Transport's employees, such interpretation would serve to create an

ambiguity in the clause requiring the Court to apply the rules of construction.  Thus, the Court

would be required to apply the least restrictive interpretation because the clause in question is

one which affords coverage under the policy.  The outcome would be the same, and the Corvette

must be deemed a covered "nonowned auto."

Accordingly, the Court finds that National Casualty has a duty to indemnify Martins

Transport for the injuries suffered by Carol Cleek as a result of the accident involving the 1974

Corvette pursuant to the coverage provided by the "nonowned auto" provision of the

Commercial Auto policy.[16]

**Monticello's Auto Exclusion**

Having determined that National Casualty is obligated under the 2001–02 Commercial

Auto policy to indemnify Martins Transport for Carol Cleek's claims, the Court must now

examine whether National Casualty alone has this duty to indemnify or whether it shares such

duty with Monticello.  Monticello points to the Auto Exclusion in its General Liability policy

which excludes from coverage bodily injury "arising out of the ownership, maintenance, use or

entrustment to others of any...auto...owned or operated by or rented or loaned to any insured."

---

[16]  At the June 10, 2005, hearing, National Casualty stipulated that if the Corvette was a
covered nonowned auto under the policy, then the Handling of Property Exclusion discussed
*supra* does not apply.

(Doc. No. 40, Ex. A, Hahn Decl., Ex. 3, Monticello Policy, Sec. I(A)(2)(g)).  It argues that Rivera's actions with regard to the Corvette constituted maintenance or use of the car as well as operation of the vehicle, bringing the underlying accident and resulting liability within the scope of this exclusion.  (Doc. No. 40, p. 18; Doc. No. 45, p. 15).

National Casualty responds that Rivera did not *operate* the Corvette within the meaning of the clause because he did nothing more than hold jumper cables to the car's battery and because Cleek in fact turned the key in the ignition.  (Doc. No. 43, p. 11).  This argument is essentially the same as that made in relation to Rivera's exclusive control of the Corvette, which the Court has already rejected, *supra*.  That Cleek, not Rivera, turned the key on and off when the Corvette caught fire is not the material fact.  Instead, because Rivera had been attempting to start the car before Cleek arrived, he requested Cleek's assistance, and he directed her activities as she provided such assistance, Rivera was in effect operating the Corvette for purposes of the Monticello exclusion.

To the extent that National Casualty argues that Cleek's injuries did not arise from Rivera's maintenance or use of an auto, courts have broadly interpreted similar "use of auto" exclusions even though exclusionary clauses are generally strictly construed.  *See, e.g.*, *Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345, 1352–53, 1358 (M.D. Fla. 2004) (under Florida law, identical exclusionary clause barred coverage where insured's box truck was parked on insured's property obstructing view of intersection and causing accident between two other motorists); *Choxom v. Bankers Ins. Co.*, 877 So. 2d 947, 948 (Fla. 4th DCA 2004) (where insured left keys in unattended vehicle and vehicle was stolen, accident caused by thief's negligent driving arose out of insured's use of vehicle for purpose of auto exclusion); *Alligator Enters.*, 773 So. 2d at 95

(applying same exclusion where insured's tractor trailer was negligently parked on roadway

causing another vehicle to collide with it) (citing *U. S. Fire Ins. Co. v. New York Marine & Gen.

Ins. Co.*, 268 A.D. 2d 19, 706 N.Y.S. 2d 377 (Sup. Ct. 2000) (words "arising out of the use" are

deemed to broad, general, comprehensive terms in auto exclusion clauses)).  Accordingly, the

Court finds that the Auto Exclusion in Monticello's General Liability policy applies to the

underlying accident and that Monticello did not have a duty to indemnify Martins Transport for

Cleek's claims.

***National Casualty's and Monticello's Respective Duties to Defend;***
***Reasonableness of Settlement and Defense Costs***

The duty of an insurer to defend its insured against a claim brought by a third party is

broader than its duty to indemnify the insured for any resulting liability.  *Safer*, 317 F. Supp. 2d

at 1358 (citing *McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 758 So. 2d

692, 695 (Fla. 4th DCA 1999)).  The Court has found that National Casualty has the duty to

indemnify Martins Transport and its assignee Monticello for the claims of Carol Cleek pursuant

to the Commercial Auto policy.  Thus, it is clear that National Casualty also had the duty to

defend Martins Transport in the underlying lawsuit.  As the assignee of Martins Transport's

interests under the policy, Monticello seeks reimbursement for the costs it incurred in defending

the Cleek litigation based on this breach of contract.  (Doc. No. 1, Count I).

The Court first looks to whether Monticello also had a duty to defend Martins Transport.

Whether an insurer has the duty to defend depends on the allegations of the complaint filed by a

third party against the insured.  *Westmoreland*, 704 So. 2d at 180.  While the duty is distinct

from and broader than the duty to indemnify, "there is no obligation on an insurer to defend an

action against its insured when the pleading in question shows the applicability of a policy

exclusion." *Safer*, 317 F. Supp. 2d at 1349 (quoting *Acceptance Ins. Co. v. Bates, Dunning &*

*Assocs., Inc.*, 858 So. 2d 1068, 1069 (Fla. 3d DCA 2003)).  The Complaint filed by Carol Cleek

in the underlying action contained the following allegations:

> 4.  [A]n employee of Martins Transport, Inc. was performing work on a 1974 Chevrolet Corvette....
> ...
> 6.  [The] employee performed this work in a negligent manner, causing the 1974 Chevrolet Corvette to ignite into flames, and/or explode, causing serious bodily injury to Plaintiff.
> 7.  [The] employee was negligent in one or more of the following ways:
>> a.  Attempting to start a vehicle which he knew or should have known was defective and susceptible to fire/explosion;
>> b.  Using a flammable substance in the engine compartment of the vehicle when he knew or should have known that the use of such substance could lead to fire/explosion; and
>> c.  Failing to warn [Cleek] of the dangers of fire/explosion associated with the vehicle.

(Doc. No. 40, Ex. A, Hahn Decl., Ex. 1, Cleek Complaint).  These allegations clearly state a

cause of action for recovery of damages resulting from an accident "arising out of the ownership,

maintenance or *use*...of any...auto...owned or *operated by* or rented or loaned to any insured" as

excluded from coverage under Monticello's policy.  (*Id.*, Ex. 3, Monticello Policy, Sec.

I(A)(2)(g)).  The Court finds that Monticello did not have a duty to defend Martins Transport

based on the pleadings in the Cleek suit.

National Casualty argues in its motion for summary judgment that Monticello is not

entitled to recover its defense costs.  First, it contends that the assignment of rights from Martins

Transport to Monticello occurred at the time the Cleek suit was settled, after Monticello had

incurred such costs; thus, Martins Transport could not effectively assign a right it did not have.

(Doc. No. 32, p. 10).  Second, National Casualty states that because Florida law does not permit

equitable subrogation as to defense costs between two insurers of a mutual insured, it is not

required to reimburse Monticello for such costs.  (*Id.*).  However, National Casualty's attention to this question is brief, and Monticello has not addressed the issue at all in its own memoranda.

Finally, in their Joint Pretrial Statement, the parties dispute whether $900,000 was a reasonable settlement amount in the underlying Cleek litigation and whether Monticello in fact expended $80,000 in defending Martins Transport in that suit.  (Doc. No. 58, p. 13).  Aside from the Declaration of Barbara Hahn, Technical Claims Manager for Monticello, which states that the Cleek suit was in fact settled for $900,000 and Monticello spent $80,000 in Martins Transport's defense, there is no record evidence concerning the reasonableness of these sums. (Doc. No. 40, Ex. A, Hahn Decl., ¶¶ 7–8).  However, the Court notes that with respect to the amount of the settlement, Florida law provides that "a primary carrier who has the duty to defend its insured, and who refuses to do so, cannot later challenge the reasonableness of the settlement...."

The Court is not confident that it has been presented with sufficient law or argument by the parties to make a determination with regard to Monticello's entitlement to reimbursement for its defense costs or the reasonableness of the settlement reached in the Cleek litigation. Accordingly, it will not rule on those issues at this time.

## Conclusion

Based on the foregoing, Plaintiff Monticello's Motion for Summary Judgment is **GRANTED**, and Defendant National Casualty's Motion for Summary Judgment (Doc. No. 30) is **DENIED**, with respect to the parties' respective duties to defend and to indemnify Martins Transport, Inc. against the claims brought by Carol Cleek in the underlying action.  The Court

does not rule on Monticello's entitlement to reimbursement for defense costs or on the

reasonableness of the Cleek settlement.


       **DONE** and **ORDERED** in Chambers in Orlando, Florida this _16th___ day of June,

2005.


PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT


Copies furnished to:

Counsel of Record